UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NORTHEAST ILLINOIS REGIONAL COMMUTER RAIL CORPORATION, | |
| Plaintiff, | Case No.: 21-cv-5988 |
| v. | Hon. Matthew F. Kennelly |
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION, et al., | |
| Defendants. | |

**SMART-TD'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. FACTUAL BACKGROUND AND LEGAL LANDSCAPE ................................................. 1

   A. Background of the Parties ................................................................................................ 1

   B. Collective Bargaining Under the Railway Labor Act ..................................................... 1

   C. Current Situation ............................................................................................................. 3

II. LEGAL STANDARD ......................................................................................................... 6

III. ARGUMENT ....................................................................................................................... 6

   A. SMART-TD is Likely to Succeed on the Merits that the Carrier's Actions Constitute a Major Dispute Under the Railway Labor Act. ................................................................ 6

      1) The Status Quo Provisions under the RLA. ................................................................. 6

      2) The Current Dispute Is Major. ..................................................................................... 8

         a. Metra is Exempt From the EO. ................................................................................ 8

         b. Metra's Failure to Bargain Prior to Changing Terms and Conditions of Employment Constitutes a Major Dispute. ........................................................... 10

         c. Metra is Required to Bargain Over the Effects of the Vaccine Mandate ............... 12

IV. CONCLUSION .................................................................................................................. 15

The Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD" or "the Union") is seeking declaratory and injunctive relief against Northeast Illinois Regional Commuter Rail Corporation d/b/a Metra ("Metra" or "the Carrier") under the Railway Labor Act ("RLA" or "the Act"), 45 U.S.C. §§ 151-88, based upon Metra's unilateral abrogation of the parties' agreements in contravention of the Act. Hiding behind the vaccine mandate imposed on federal contractors, Metra has imposed changes to the terms and conditions of employment without engaging in the required bargaining process set forth in Section 6 of the RLA. 45 U.S.C. § 156. In addition, Metra has failed and/or refused to bargain with SMART-TD over the effects of its vaccine mandate. In essence, the Carrier has rewritten the terms of its agreements with the Union in violation of the RLA, entitling the Union to a status quo injunction.

## I. FACTUAL BACKGROUND AND LEGAL LANDSCAPE

### A. Background of the Parties

Metra is a common carrier by railroad engaged in interstate commerce, and is a "carrier" as defined by the RLA. 45 U.S.C. § 151 First. (Docket Entry ("D.E.") 20, Counterclaim ("CC") ¶ 4). SMART-TD is the duly authorized "representative" of train service employees employed by the Carrier. 45 U.S.C. § 151 Sixth. (D.E. 1, Compl. at ¶ 7).

### B. Collective Bargaining Under the Railway Labor Act

Collective bargaining between railroads and their employees' representatives over rates of pay, rules, and working conditions is governed by the RLA. 45 U.S.C. § 151, *et seq*. The primary directive of the RLA is set out at the very beginning of the Act.

> It <u>shall be the duty of all carriers</u>, their officers, agents, and employees <u>to exert every reasonable effort to make and maintain agreements</u> concerning rates of pay, rules, and working conditions …

1

45 U.S.C. § 152 First (emphasis added). This is not a mere exhortation, but a directive to the parties, *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 577 (1977), and "has been described as the 'heart' of the RLA." *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,* 243 F.3d 349, 361 (7th Cir. 2001) (citing *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377-78 (1969)). The status quo provisions command that a carrier must maintain current working conditions, and that unilateral changes in those conditions are prohibited absent engaging in the required bargaining process. 45 U.S.C. §§ 152, Seventh, 156.

To resolve disputes between the parties, the RLA established two separate mandatory dispute resolution procedures: one for "minor disputes" and one for "major disputes." These terms are not found in the RLA's text, but are shorthand terms developed by the courts to describe the Act's dispute resolution procedures. *See generally Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 307 (1989) ("*Conrail*"). A "major dispute" is a dispute over contract formation or amendment of a collective-bargaining-agreement ("CBA"). *Elgin, Joliet & E. Ry. v. Burley*, 325 U.S. 711 (1945). Such disputes arise where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. *Conrail*, 491 U.S. at 302. "The issue in a major dispute 'is not whether an existing agreement controls the controversy; instead, the focus is on 'the acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past.'" *Wheeling & Lake Erie Ry. v. Bhd. of Loco. Eng'rs & Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015) (hereinafter "*W&LE*") (citing *Burley,* 325 U.S. at 723).

For major disputes, the Act provides a detailed framework for resolution. Under the RLA, a CBA exists in perpetuity and can only be changed through a very specific process. 45 U.S.C. § 156. The "major dispute" procedures are initiated by the service of a bargaining notice under

Section 6, 45 U.S.C. § 156. These "Section 6 Notices" are written proposals for changes in CBAs. *See CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365 (6th Cir. 2005). The "major dispute" procedures include conference, negotiation, and mediation between the parties. 45 U.S.C. §§ 152 Second, 155 First, 156, 160. Until these procedures have been exhausted, the parties are bound by the Act's "status quo" requirements. *See, e.g., Conrail*, 491 U.S. at 302-03; 45 U.S.C. §§ 152 First, 152 Seventh, 156. Only once these procedures have been exhausted, are the parties free to engage in self-help. *See generally, Burlington N. R.R. v. Bhd. of Maint. of Way Empl.*, 481 U.S. 429 (1987); *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 149 (1969) ("*Shore Line*").

In contrast, a "minor dispute" is a disagreement growing out of the interpretation or application of an existing CBA, rather than an attempt to change CBA terms. *See, e.g., Conrail*, 491 U.S. at 303; *Henegar v. Banta*, 27 F.3d 223, 225 (6th Cir. 1994). "Minor disputes" are required to be addressed by the parties first through handling "on the property," 45 U.S.C. §§ 152 Sixth, 153 First (i), and if the dispute is not resolved through such, by final and binding arbitration. *Id*. § 153 First (i); *see also Conrail*, 491 U.S. at 303.

The issue presented here is a major dispute. The Carrier is attempting to ignore the mandatory process by unilaterally imposing changes to the working conditions established through the parties' CBA and settled past practice. Court intervention is necessary to uphold the Act and maintain the status quo.

### C. Current Situation[1]

The Union and the Carrier are parties to CBAs that control the terms and conditions of

---

[1] The facts concerning this matter are contained in the respective Verified Complaint and Declaration filed herewith, the essential portions of which are reproduced below.

3

employment. On September 9, 2021, President Biden issued a pair of executive orders containing vaccine mandates for federal executive agencies and *certain* federal contractors. Presidential Documents, Executive Order 14042 of September 9, 2021, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed.Reg. 50985 (Sept. 14, 2021) (hereinafter "EO"). The EOs stated rationale is to "provide adequate COVID-19 safeguards to [contractors'] workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this order, … which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors … ." *Id.* at Sec. 1. However, Section 5(a) sets forth the applicability of covered contractors, including contracts covered by the Service Contract Act ("SCA"), *id.* at Sec. 5(a)(ii), which explicitly excludes "contracts for carriage of freight or personnel by … railway line … where published tariff rates are in effect." 41 U.S.C. § 6702(b)(3).

On September 24, 2021, the Safer Federal Workforce Task Force ("SFWTF") issued its "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," *available at* https://www.saferfederalworkforce.gov/contractors/. This guidance requires "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation …" by December 8, 2021. *Id.*at 5.

On October 28, 2021, White House Coronavirus Response Coordinator Jeff Zients clarified that the Administration's deadline would not require the immediate layoff of unvaccinated workers, and "for any of the probably relatively small percent of employees that are not in compliance they'll go through education, counseling, accommodations and then enforcement." https://www.reuters.com/world/us/white-house-signals-flexibility-over-dec-8-vaccine-deadline-businesses-2021-10-27/. "We're creating flexibility within the system … There

4

is not a cliff here," Zients said, emphasizing the goal is to get people vaccinated "not to punish them so we do not expect any disruptions." *Id.* Indeed, such is consistent with the SFWTF's recommendations to covered contractors when an employee refuses to be vaccinated.[2]

On November 1, 2021, Metra Chief Executive Officer Jim Derwinski ("CEO Derwinski") issued a letter to all Metra employees announcing he had decided to impose a vaccine mandate on the Metra workforce, stating, "I have made the difficult decision to implement a COVID-19 vaccination mandate at Metra without an option for testing in lieu of the vaccine." (Waugh Decl. ¶ 3, Ex. A). CEO Derwinski announced his decision without reference to any mandate. Rather, merely relying on his own authority, he noted "a dramatically increasing trend at the federal, state, county, local levels and in the private sector that mandating the vaccine is the most prudent course of action to help everyone get back to our pre COVID-19 world," and further cited medical experts with respect to the effectiveness of vaccines. (*Id.*). Employees already vaccinated have been instructed to submit proof to Human Resources by December 7, 2021. (*Id.*). Unvaccinated employees are required to submit proof of a first does by December 7, 2021, and of their second dose by January 7, 2022. (*Id.*).

On November 8, 2021, SMART-TD General Chairperson Edward Waugh ("GC Waugh") responded to CEO Derwinski's announcement, noting that while he understood the seriousness of the pandemic, the mandate violated the RLA's status quo provisions. (D.E. 20, CC ¶ 18; Waugh Decl. ¶ 3, Ex. B). GC Waugh requested an immediate meeting to negotiate any proposed

---

[2] *See* https://www.saferfederalworkforce.gov/faq/contractors/ (noting "[g]uidance for Federal agencies is to utilize an enforcement policy that encourages compliance, including through a limited period of counseling and education, followed by additional disciplinary measures if necessary. Removal occurs only after continued noncompliance. Guidance for Federal agencies is that employees should not be placed on administrative leave while the agency is pursuing an adverse action for refusal to be vaccinated but will be required to follow safety protocols for employees who are not fully vaccinated when reporting to agency worksites.").

5

changes to the terms and conditions of employment of Metra employees represented by SMART-TD. (D.E. 20, CC ¶ 18; Waugh Decl. ¶ 4, Ex. B). Rather than respond to GC Waugh, Metra instead filed the present suit on November 8, 2021, now asserting that it is relying on the mandate for federal contractors as the reason for implementation. (D.E. 1, Compl. ¶ 2). Further, on November 23, 2021, Metra went on to announce it was unilaterally offering four hours of pay at an employee's regular rate for each dose of the vaccine taken and eight hours of pay for taking a day off within 24 hours of receiving a dose of the vaccine. (Waugh Decl. ¶ 6, Ex. C). Metra has yet to respond to GC Waugh's request to meet and negotiate. (Waugh Decl. ¶ 5).

## II. LEGAL STANDARD

"The purpose of preliminary injunctive relief is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir.1998). Courts consider the following when deciding whether to grant injunctive relief: (1) whether the movant has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) the threat of irreparable harm to the movant; (4) the balance of harms between the movant and other party; and (5) the public interest. *Id.* As demonstrated herein, the Union's case meets these factors. Metra prematurely resorted to self-help in violation of its statutory status quo requirements and the Union is entitled to an injunction restoring the status quo. *See Conrail,* 491 U.S. at 303; *see also W&LE*, 789 F.3d at 691.

## III. ARGUMENT

### A. SMART-TD is Likely to Succeed on the Merits that the Carrier's Actions Constitute a Major Dispute Under the Railway Labor Act.

#### *1) The Status Quo Provisions under the RLA.*

The RLA's purposeful directive bars a carrier from unilaterally altering the existing

6

employment conditions or the terms of the bargained-for agreement. 45 U.S.C. § 152 First, Seventh. Any change can <u>only</u> be accomplished through the required process of Section 6. 45 U.S.C. § 156. Despite such, Metra here has altered the wages and terms and conditions of employment without engaging in any negotiations. Such unilateral change violates the Act and must be enjoined.

Section 2, First which, as noted above, "has been described as the 'heart' of the RLA," provides:

> It <u>shall be the duty of all carriers</u>, their officers, agents, and employees to exert every reasonable effort <u>to make and maintain agreements concerning rates of pay, rules, and working conditions</u>, and to settle all disputes, whether arising out of the application of such agreements or otherwise …

45 U.S.C. § 152, First (emphasis added). Section 2, Seventh provides:

> <u>No carrier</u>, its officers or agents <u>shall change the rates of pay, rules or working conditions</u> of its employees as a class as embodied in agreements **except** in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152 Seventh (emphasis added). These provisions command that the Carrier <u>must</u> maintain current working conditions, and that unilateral changes to those conditions are prohibited absent engaging in the required bargaining process set forth in Section 6. 45 U.S.C. § 156 ("<u>In every case</u> where such notice of intended changes has been given … rates of pay, rules, or working conditions <u>shall not be altered by the carrier until the controversy has been finally acted upon</u> … .") (emphasis added).

Collectively, these provisions constitute the status quo provisions of the Act, and may be enforced by the issuance of a status quo preliminary injunction without the necessity of showing irreparable harm. *See Conrail*, 491 U.S. at 303 ("[T]he district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury."); *see also Shore Line,* 396 U.S. at 156-57

7

(citing Section 2 Seventh, 45 U.S.C. § 152 Seventh); *Chicago & Nw.,* 402 U.S. 570 (citing Section 2 First, 45 U.S.C. § 152 First); *W&LE*, 789 F.3d at 691.

### 2) The Current Dispute Is Major.

Where carriers attempt to ignore and change the terms of the agreement, as Metra does here, courts have found such disputes to be "major." *See* 45 U.S.C. § 152 Seventh; *Shore Line*, 396 U.S. 142 (enjoining employer's attempt to change working conditions without bargaining); *see also W&LE*, 789 F.3d. at 696 (finding carrier's violation of the crew consist provision to be a major dispute); *Bhd. of Loco. Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 31-32 (1st Cir. 2000) (finding carrier's failure to negotiate right to contract out work in CBA and subsequent attempt to contract out work to related corporation raised major dispute); *St. Louis Sw. Ry. v. Bhd. of R.R. Signalmen*, 665 F.2d 987, 998 (10th Cir. 1981); *Burlington N. R.R. v. United Transp. Union*, 862 F.2d 1266, 1275 (7th Cir. 1988); *United Transp. Union v. Gateway W. Ry.*, No. 95-0908-CV-W-1 1995 WL 842729, at *2-3 (W.D.Mo. Nov. 14, 1995) (finding major dispute where carrier ignored seniority provisions in contract and promoted employees out of order.) Here, Metra has changed the agreement, imprinting new terms without bargaining. *Shore Line*, 396 U.S. 142; *Florida East Coast Ry. v. Bhd. of Loco. Eng'rs*, 362 F.2d 482, 483 (5th Cir. 1966) (until railroad complies with "major" dispute process there can be no change in working conditions). Such is a major dispute and should be enjoined.

  **a. Metra is Exempt From the EO.**

While Metra belatedly attempts to rely on the EO, such reliance is in jeopardy. On November 30, 2021, a decision enjoining the federal government from enforcing the vaccine mandate with regard to federal contractors, which Metra now contends it is, issued. *See Kentucky v. Biden*, No. 3:21-cv-00055, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021). While the full impact

8

of this decision has yet to come to fruition, it certainly places any reliance by Metra to refuse to negotiate over terms and conditions of employment regarding this mandate on treacherous footing. Moreover, until this Complaint, the only reason given by Metra for the mandate was the CEO was implementing it. The EO position presented, only for the first time in litigation, rings hollow. As an initial matter, Metra does not identify how it, being a passenger rail carrier, qualifies as a federal contractor in any sense. Only the barest of allegations are presented in the Complaint. (D.E. 1, Compl. ¶ 2).

> Notwithstanding that, Section 5 of the EO limits its applicability to:
>
> any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument, **if**: … **(ii) it is a contract or contract-like instrument for services covered by the [SCA], 41 U.S.C. 6701 *et seq*. …**

EO Sec. 5 (emphasis added). The only section any contract Metra has with the government that would arguably fall under is (a)(ii), a contract for services covered under the SCA. EO Sec. 5(a)(ii). Indeed, Metra merely asserts without any evidence provided to date, that it is subject to the EO. (D.E. 1, Compl. ¶ 2; Waugh Decl. ¶ 3). However, even if it is accurate that Metra is a government contractor, the SCA expressly excludes "a contract for the carriage of freight or personnel by vessel, airplane, bus, truck, express, railway line … where published tariff rates are in effect." 41 U.S.C. § 6702(b)(3).

This exclusion was analyzed by the Eighth Circuit in *Williams v. U.S. Dep't of Lab.*, 697 F.2d 842 (8th Cir. 1983). In that case, it was alleged that Williams, who contracted with the Air Force for preparation of personal property of military personnel for movement and storage, violated the SCA by failing to pay his employees the required prevailing wage rates. *Id.* Williams contended he was exempted citing to then § 356(3), which exempts "[a]ny contract for the carriage of freight … by truck … where published tariff rates are in effect." 697 F.2d at 843.

9

The administrative law judge ("ALJ") found the contracts were "primarily for packing and unpacking and related services and [were] not primarily for the carriage of freight," and therefore the exemption did not apply. *Id.* at 843-44. The district court and Eighth Circuit "looked to the broader transactional setting and the economic reality of these contracts," and affirmed the decision, noting that the "intent of the contracts ware [sic] to provide Scott Air Force Base with packing and crating" and not for carriage. *Id.* at 843-45 (quoting *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947)). In contrast, presumably the intent of any contracts between Metra and the government is for the carriage of freight and/or personnel. Therefore, the SCA's express exclusion renders the EO inapplicable to Metra, and its excuse for not bargaining evaporates.

Indeed, such is consistent with Metra's previous noncompliance with Executive Orders containing nearly verbatim applicability language and exclusions. For example, former President Barack Obama signed Executive Order 13706, Establishing Paid Sick Leave for Federal Contractors, on September 7, 2015, requiring parties that contract with the Federal Government to provide their employees with up to seven days of paid sick leave annually, including paid leave allowing for family care. 80 FR 54697. That EO likewise applied to contracts covered by the SCA. *See id.*, Sec. 6(d)(i)(B). In the six years since the EO's mandate of paid sick leave on federal contracts, Metra has made no effort to comply with such, likely concluding it is exempt. If so, it follows Metra is also exempt from the instant EO, which contains identical applicability language and exclusions. *Compare* 80 FR 54697, Sec. 6, with EO, Sec. 5. Metra cannot hold such directly contrary positions as suits their needs on any given day.

### b. Metra's Failure to Bargain Prior to Changing Terms and Conditions of Employment Constitutes a Major Dispute.

In contending the dispute is minor, Metra asserts that it has a "well-settled past practice

10

of unilaterally changing its rules and policies governing position requirements, medical standards, and safety in response to lawful federal government directives." (D.E. 1, Compl. ¶ 13). Specifically, Metra points to Federal Railroad Administration ("FRA") regulations regarding conductor certification and drug and alcohol testing promulgated by the FRA. (D.E. 1, Compl. ¶ 17).

Following FRA regulations enacted after proper rulemaking does not make this matter a minor dispute. Such an argument is fallacious and misses the point. It ignores the RLA which controls Metra's actions here. The RLA was enacted by Congress to ensure that "rates of pay and working conditions … shall not be altered," except through the proper process. *Shore Line* at 152 n.19. The Carrier cannot circumvent the bargaining process set forth in the Act under the guise of following an EO. Furthermore, usurping the collective bargaining rights of represented employees was not the intent of the EO here. Indeed, Administration officials and SFWTF have made that clear. *See supra*. Moreover, an executive order – even where applicable – is not an act of Congress or a regulation promulgated by the federal agency tasked with enforcing rail safety matters, *i.e.* the FRA.

To the extent that Metra now contends that it has an implied right to set fitness for duty standards under existing agreements and therefore the unilateral implementation of a vaccine mandate is a minor dispute, such is not in accord with the controlling law or facts. (Metra Compl. ¶ 13, 23-24). Indeed, nowhere in the Metra's vaccine mandate policy do they even mention that vaccination is required as a matter of fitness for duty. *See, e.g.,* Waugh Decl. ¶ 7, Ex. A. Nor has Metra articulated how an unvaccinated employee is medically unfit for duty.

Metra has made a vaccine requirement mandatory and those failing to comply are subject to discipline. (Waugh Decl. Ex. A). Metra has changed the terms and conditions of employment

11

without engaging in the required Section 6 bargaining process. Until completion of that process, Metra must return to the "actual, objective working conditions and practices" that were in effect prior, *i.e.* the *status quo* that existed before imposition of the vaccine mandate. *Shore Line,* 396 U.S. at 152-53; *Jacksonville Terminal Co.*, 394 U.S. at 378 ("While the dispute is working its way through [the Section 6] stages, neither party may unilaterally alter the status quo. §§2, Seventh; 5, First; 6; 10 [45 U.S.C. §152, Seventh; §155, First; §156, §160].").

   c. **Metra is Required to Bargain Over the Effects of the Vaccine Mandate**

The law is well settled that an employer has a duty to engage in bargaining over the "effects" of management decisions, even where it may not be required to bargain over the decision itself. *See, e.g., First Nat'l Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 681 (1981);[3] *see also Pittsburgh & Lake Erie R. Co. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 490, 512 (1989) ("*P&LE*") (holding railroad had duty to bargain over effects of line sale); *C&NW v. RLEA*, 908 F.2d at 152 (same); *Ry. Lab. Executives' Ass'n v. Chicago & Nw. Transp. Co.*, 890 F.2d 1024, 1026 (8th Cir. 1989) ("*RLEA v. C&NW*").[4] Indeed, at least one Circuit has held that the failure to engage in effects bargaining constitutes a major dispute. *RLEA v. C&NW*, 890 F.2d at 1026 ("[I]n *P&LE,* and the Supreme Court there held that the dispute was a major one and that the railroad company was obligated to bargain with the union as to the effects of the sale.").

---

[3] The NLRB General Counsel recently issued a Memorandum clarifying that an employer must bargain in response to the Department of Labor's coronavirus Emergency Temporary Standard. *Responding to Inquiries Regarding Bargaining Obligations Under the Department of Labor's Emergency Temporary Standard to Protect Workers from Coronavirus*, GC 22-03 (Nov. 10, 2021).

[4] Effects bargaining under the RLA has predominately been raised by unions in line sale cases. In those cases, courts have uniformly held that even though the railroad does not have a duty to bargain over the decision to sell its line, it did have a duty to bargain over the effects of such decision. *See, e.g., P&LE*, 491 U.S. at 503; *C&NW v. RLEA,* 908 F.2d at 152; *RLEA v. C&NW*, 890 F.2d at 1026.

12

Therefore, regardless of whether the EO applies to Metra and whether Metra must bargain over the mandate itself, <u>at a minimum</u>, the RLA commands that it engage in effects bargaining. As applied here, bargainable issues surrounding any mandate may include the amount of time before the mandate takes effect; the impact on an employee who fails to comply with any mandate; any paid time off to get vaccinated, to deal with any adverse reactions from vaccination; how vaccination status will be confirmed; whether there are any viable alternatives to a vaccine mandate; and incentives to encourage vaccination.

Metra failed to bargain over any of these effects, but has instead unilaterally implemented other "effects," including payments directly to represented individuals. (Waugh Decl. ¶¶ 4, 6, Exs. B, C). Moreover, despite that the parties have been involved in Section 6 bargaining since October 2018, Metra has not seen fit to include these changes of terms and conditions of employment in its Section 6 Notice or any negotiations, despite the undisputed fact that the issues of pay and time off have been part of those negotiations. (*Id.* ¶ 8, Ex. D). This process has not yet come to an end. (*Id.*). Accordingly, those subjects are subject to the status quo requirement of the RLA, and cannot be unilaterally changed by Metra.

**D. No Showing of Irreparable Injury is Necessary to Issue a Status Quo Injunction.**

Courts have long held that no showing of irreparable harm is required to issue a status quo preliminary injunction. *See, e.g., Flight Options, LLC v. Int'l Bhd. Of Teamsters 1108,* 863 F.3d 529, 545 (6th Cir. 2017) (noting "[t]he second factor is inapplicable in the context of an RLA dispute, because courts may enjoin a violation of the status quo pending completion of the required [Section 6] procedures, without the customary showing of irreparable injury.'") (quoting *Conrail*, 491 U.S. at 303; *see also S. Ry. Co. v. Bhd. of Loco. Firemen & Enginemen*, 337 F.2d 127, 133-34 (D.C. Cir. 1964) (holding irreparable injury showing unnecessary for

13

preliminary injunction under RLA status quo provision); *W&LE*, 789 F.3d at 691 ("[T]he party moving for injunctive relief in federal court is not required to make the usual showing of irreparable injury."). Nevertheless, the Union would be irreparably harmed by the Carrier's violation of the status quo, in contravention of the statutory mandate of the RLA.

> D. **The Balance of Harms Favors a Status Quo Injunction.**

In addition to not requiring a showing of irreparable harm, courts routinely grant status quo injunctions under the RLA without weighing the traditional balancing of equities. *See, e.g., Brotherhood of Maint. of Way Empl., Lodge 16 v. Burlington N. R.R. Co.,* 802 F.2d 1016, 1021 (8th Cir. 1986) ("If the dispute is major [under the RLA], the courts have broad powers to enjoin unilateral action by either side in order to preserve the status quo while settlement procedures go forward. Such an injunction may issue <u>without regard to the usual balancing of the equities</u>.") (emphasis added). Even if such was required, however, the balance of harms weighs in the Union's favor and supports the issuance of the requested injunctive relief. Indeed, as recognized in *Flight Options*, the Carrier is "unlikely to suffer substantial harm from being required to preserve the status quo," in part where they are "obliged by statute to do so." 863 F.3d at 545. Here, no harm will befall Metra in granting an injunction that maintains the status quo, while the Union and employees will be harmed by the failure of Metra to abide by the existing agreements and bypassing the Union before instituting changes to the mandatory terms and conditions of employment. By its very nature, bypassing the Union undermines the Union's status and power as the collective bargaining representative and risks diminishing the Union in its members' eyes. *See Small v. Avanti Health Sys.,* 661 F.23d 1180, 1191-92 (9th Cir. 2011).

> D. **Public Interest Favors the Issuance of SMART-TD's Requested Injunction.**

Consistent with the primary purpose of the RLA to make and maintain agreements, and

14

in furtherance of parties abiding by the law and agreements they make, public interest <u>strongly</u> favors <u>preserving</u> the status quo required by the RLA. *See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 238 F.3d 1300, 1308 (11th Cir.), *cert. denied,* 532 U.S. 1019 (2001) ("We note that in RLA cases a [party] need not show irreparable injury, a usual prerequisite for obtaining an injunction, to enjoin a violation of the *status quo* because of the strong public interest in enforcing the RLA."); *see also Union Pac. R.R. Co. v. Bhd. of Maint. of Way Employees Div. of Int'l Bhd. of Teamsters*, 509 F. Supp. 3d 1117, 1132 (D. Neb. 2020) (noting "public interest favors maintaining the status quo and avoiding major disruption to the nation's rail lines"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1105-06 (D.C. Cir. 2019). The public interest does not favor an employer unilaterally imposing invasive requirements regarding terms and conditions of employment, especially where well-settled statutes provide that such issues be resolved in negotiations.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should issue a preliminary injunction requiring Metra to bargain with the Union prior to implementing any changes to the terms and conditions of employment for represented employees.

Respectfully submitted,

/s/ Kevin C. Brodar
Kevin C. Brodar
General Counsel
Erika A. Diehl-Gibbons
Associate General Counsel
Shawn M. McKinley
Assistant General Counsel
SMART-TD
24950 Country Club Blvd. Ste. 340
North Olmsted, OH 44070
Tel: (216) 228-9400
Fax: (216) 228-0937
ediehl@smart-union.org
kbrodar@smart-union.org

Robert E. Harrington, III
DUNN HARRINGTON LLC
22 W. Washington St., Suite 1500
Chicago, Illinois 60602
Tel: (773) 704-7088
reh@dhinjurylaw.com

Attorneys for SMART-TD

## CERTIFICATE OF SERVICE

    I hereby certify that on this 3rd day of December 2021, I caused the foregoing to be filed in this Court's CM/ECF system. I also certify that the foregoing document is being served via upon all attorneys of record via the CM/ECF system.

                                                    /s/ Erika A. Diehl-Gibbons
                                                    Erika A. Diehl-Gibbons

Case: 1:21-cv-05988 Document #: 25 Filed: 12/03/21 Page 19 of 19 PageID #:158