**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NORTHEAST ILLINOIS REGIONAL COMMUTER RAIL CORPORATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 21 C 5988** |
| **INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL, AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION; BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN; BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; and METROPOLITAN ALLIANCE OF POLICE, CHAPTER 267,** | ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Northeast Illinois Regional Commuter Rail Corporation (Metra) filed suit against three of the unions that represent groups of its employees, seeking a declaratory judgment that its imposition of a coronavirus vaccination mandate is a "minor dispute" under the Railway Labor Act (RLA), meaning that any dispute would have to be resolved by binding arbitration, as opposed to collective action such as a strike. Two of the unions—the International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division (SMART-TD) and Brotherhood of Locomotive Engineers and Trainmen (BLET)—counterclaimed and moved for a preliminary

injunction barring Metra's imposition of the vaccination mandate.  A fourth union, Metropolitan Alliance of Police, Chapter 267 (MAP), was granted leave to intervene as a defendant and joined in the motions for preliminary injunction.[1]  For the following reasons, the Court denies the unions' motions.

## Background

Metra is a common carrier by railroad in the Chicago metropolitan area. SMART-TD, BLET, BMWE, and MAP are labor unions representing Metra employees.

On September 9, 2021, President Joseph Biden issued an executive order containing coronavirus vaccination mandates for federal executive agencies and certain federal contractors.  Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 14, 2021).  The executive order requires executive departments and agencies to ensure that covered federal contracts include a clause requiring the contractor to comply with guidance published by the Safer Federal Workforce Task Force (SFWTF), which mandates, among other things, the vaccination of all covered contractor employees against the coronavirus, except in limited circumstances.  *Id*. § 2(a); SFWTF, COVID-19 Workplace Safety:  Guidance for Federal Contractors and Subcontractors 1 (2021).  Section 5 of the executive order states that it applies to, among others, "a contract or contract-like instrument for services covered by the Service Contract Act."  *Id*. § 5.  The Service Contract Act applies to any contract with the federal government that exceeds $2,500 and "has as its principal purpose the furnishing of services in the United States through

---

[1] One of the unions sued by Metra, the Brotherhood of Maintenance of Way Employes [sic] Division of the International Brotherhood of Teamsters (BMWE), has not yet answered Metra's complaint or counterclaimed, but it has participated in the hearings conducted by the Court and is aligned with the other defendants.

2

the use of service employees."  41 U.S.C. § 6702(a).

On November 1, 2021, Metra's Chief Executive Officer Jim Derwinski issued a letter to all Metra employees announcing a coronavirus vaccination mandate for the Metra workforce.  The mandate does not have an option for testing in lieu of vaccination.  Under the mandate, employees who had already been vaccinated were required to submit proof to Human Resources by December 7, 2021.  Unvaccinated employees were required to submit proof of their first dose by December 7, 2021 and their second dose by January 7, 2022.  An employee who fails to comply with the mandate and has not been granted a medical or religious accommodation may be subject to discipline, including termination.

After CEO Derwinski's announcement, the unions separately requested meetings with Metra to negotiate any proposed changes to the terms and conditions of employment of the employees whom they represent.  Metra did not respond to these requests.  Instead, Metra filed the present suit on November 8, 2021, seeking a declaratory judgment that the parties' dispute regarding the vaccination mandate is a minor dispute under the RLA and that the unions and their members cannot lawfully strike or engage in other forms of self-help to address the matter.

On November 23, 2021, Metra announced that it was offering employees four hours of pay at an employee's regular rate for each dose of the vaccine taken and eight hours of pay for taking a day off within 24 hours of receiving a dose of the vaccine.

On December 3, 2021, SMART-TD and BLET each filed a motion for a preliminary injunction.  MAP later filed a motion to intervene in the case, which the Court granted, and it then joined in the preliminary injunction motions.  On January 3, 2022,

the Court held oral argument on the motions.

## Discussion

Under the RLA, there are two distinct statutory processes for resolving labor disputes between a railroad and its employees.  One set of procedures is reserved for "major" disputes:  the "extensive and exhaustive bargaining" process outlined in section 6 of the RLA.  *Nat'l Ry. Lab. Conf. v. Int'l Ass'n of Machinists and Aerospace Workers*, 830 F.2d 741, 745 (7th Cir. 1987).  This process includes negotiation between the parties, mediation by the National Mediation Board, and potentially a review and report by an emergency board appointed by the President.  *Id.*  During the pendency of the bargaining process, the parties are required to maintain the status quo.  *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n* (*Conrail*), 491 U.S. 299, 302–03 (1989).  Specifically, the employer may not implement the disputed policy, and a court may issue a status quo injunction to enforce this mandate.  *Id.* at 303.  If the parties have not reached an agreement at the end of this process, they may resort to self-help.  *Id.*

Alternatively, a dispute can be classified as a "minor" dispute, in which case it is subject to mandatory arbitration under section 3 of the RLA.  *Id.*  For a minor dispute, the parties must submit to arbitration before an adjustment board, which exercises exclusive jurisdiction over the dispute.  *Id.* at 303–04.  In contrast to major disputes, employers do not have a statutory obligation to maintain the status quo pending the results of arbitration; the disputed policy may be put into effect immediately.  *Id.* at 304.

In cases involving railway labor disputes, a federal court's "jurisdiction to resolve the underlying contractual dispute depends on whether it is 'major' or 'minor,'" and for this reason, the court's role is first and foremost that of a "taxonomist."  *Bhd. of*

*Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017). Congress did not explicitly define either term in the RLA, but "[t]he case law establishes that major disputes are those over the formation or alteration of collective bargaining agreements while minor disputes are those over the interpretation of existing collective bargaining agreements." *Nat'l Ry. Lab. Conf.*, 830 F.2d at 745–46.

The purpose of the RLA is to avoid disruptions to commercial use of railways. *Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 758. Thus, "in making the choice between major and minor, there is a large thumb on the scale in favor of minor"—as minor disputes cannot be dealt with via a strike or a lockout. *Id.* The Seventh Circuit has made it clear that "if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Ry. Lab. Execs. Ass'n v. Norfolk & W. R.R.*, 833 F.2d 700, 705 (7th Cir. 1987).

In *Conrail*, the Supreme Court stated that the relevant inquiry involves whether the railroad's contention that it has the authority to unilaterally implement the policy in question is "neither obviously insubstantial or frivolous, nor made in bad faith." *Conrail*, 491 U.S. at 310. If the railroad can meet this relatively low bar, the dispute is classified as minor, and the adjustment board has exclusive jurisdiction over the dispute. *Id.* When considering the collective bargaining agreement, the court looks not just to the agreement's express terms but also the parties' past practices. *Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 758.

The unions take issue with two of Metra's policies: (1) the vaccination mandate and (2) the vaccination-related incentive payments. They argue that these changes involve major disputes and that for this reason the Court should enjoin implementation

of the policies pending conclusion of the section 6 mandatory bargaining process. Additionally, with respect to the vaccination mandate, the unions contend that, even if the Court finds that it involves a minor dispute, the Court should still issue a preliminary injunction to preserve the jurisdiction of the adjustment board pending arbitration of the dispute.

## A. Major or minor dispute

### 1. The vaccination mandate

The unions argue that Metra's vaccination mandate represents an alteration of their collective bargaining agreements and thus constitutes a major dispute. In contrast, Metra contends that the dispute is appropriately characterized as minor because, under the collective bargaining agreements and past practice, it has the authority to unilaterally institute a vaccination mandate. Specifically, Metra argues that its past practice of unilaterally implementing changes in response to federal law permits it to institute the vaccination mandate in response to the executive order. Metra also argues that it has a long history of implementing fitness and safety standards that allows it to impose a vaccination requirement unilaterally.

#### a. Changes in response to federal law

The unions do not dispute that Metra has unilaterally implemented changes in response to federal law in the past. Instead, they argue that this past practice is not applicable because the executive order is different from the other federal laws and regulations cited by Metra. Specifically, they emphasize that Metra made the previous changes in response to congressional statutes and regulations enacted after what they call "proper" rulemaking, whereas the current change was made in response to an

executive order.  SMART-TD Mem. at 11.  The unions fail to explain, however, why this claimed distinction matters.  And they cite no authority supporting the proposition that the President's executive order should be treated differently from, say, a federal regulation.  Under the circumstances, Metra's contention that past practice allows it to act unilaterally is most certainly *not* "obviously insubstantial or frivolous."

The unions further contend that the executive order and the previous federal laws cited by Metra in making unilateral moves are distinguishable because "[m]ost of the federal statues [sic] and agency actions Metra cites to were lobbied for by the Union and resisted by carriers and other employer groups."  SMART-TD Reply at 6 (emphasis in original).  This argument, however, was made for the first time in a reply brief and is thus forfeited for the purposes of these motions.  *See Wonsey v. City of Chicago*, 940 F.3d 394, 398–99 (7th Cir. 2019).  Even if that were not the case, the unions again offer no support for the proposition that their support for a prior action by Metra matters in the analysis.  That aside, they notably do not contend that they supported *all* of the cited federal statutes and agency actions.  This tends to support the proposition that Metra does have a past practice—though perhaps less extensive—of unilaterally imposing workplace changes in response to federal laws that were not lobbied for by the unions.

The unions also argue that Metra cannot rely on the executive order because it does not apply to Metra.  Metra says it is bound by the executive order because of its participation in the Transportation Security Administration's (TSA) National Explosives Detection Canine Team Program (Canine Program).  After the President issued the executive order, Metra and TSA entered into an amended contract that expressly incorporated the executive order's vaccination mandate.

7

In response, the unions argue that the Canine Program contract is not actually a contract but rather a grant and is thus expressly excluded by the terms of the executive order.[2]  The unions contend that Metra's Senior Director of Labor Relations, Thomas Stuebner, acknowledged in a declaration submitted in this case that the Canine Program is part of a grant program and that Metra does not provide the government any consideration for the services provided under the program.  This is a plausible reading of the Stuebner declaration, but the unions' interpretation is by no means conclusive. Metra has a viable argument that the Canine Program is part of a contract between Metra and the federal government.  Its contention that its Canine Program renders it a federal contractor bound by the executive order is not "obviously insubstantial or frivolous."

The unions further argue that Metra cannot rely on the amended contract with TSA because it was not required to enter into the amended contract.  They state: "There is nothing in the Mandate that requires contractors to add such clauses.  Rather Metra is free to refuse the addition of such clauses and simply cease contracting with the federal government."  BLET Mem. at 8.  Metra disagrees, arguing that a union "cannot require or demand that a carrier no longer be a federal contractor to avoid application of Executive Order 14042."  Metra Resp. at 9 (quoting *Sw. Airlines Pilots*

---

[2] The unions also argue in their opening briefs that Metra falls within an exclusion in the executive order saying the contractor mandate does not apply in a case involving "a contract for the carriage of freight or personnel by . . .  railway line . . . where published tariff rates are in effect."  41 U.S.C. § 6702(b)(3).  But it appears that the unions have abandoned this argument in favor of their new point—the "grant" argument—as they did not reference the claimed exclusion in their reply briefs.  In any case, as Metra correctly points out, its contract with the federal government is not a contract for the carriage of freight or personnel.  Rather, the contract is for services (i.e., the Canine Program) that Metra receives from the government.

*Ass'n v. Sw. Airlines Co.*, No. 3:21-cv-02065-M, 2021 WL 4975010, at *11 (N.D. Tex. Oct. 26, 2021)).  Without deciding the merits of the issue, the Court concludes that Metra's argument on this point is not "obviously insubstantial or frivolous."  There is certainly a colorable argument to be made that a carrier is not required to give up its government contracts to avoid application of federal mandates.  Thus the unions' argument does not move the needle on Metra's contention that the dispute is a "minor dispute" under the RLA.

      Next, the unions contend that Metra's past practices indicate that it does not actually consider itself to be a federal contractor.  Specifically, the unions say, Metra did not attempt to comply with Executive Order 13706, which, like the executive order in this case, applies to federal contracts subject to the Service Contract Act.  But Metra provides a not "obviously insubstantial or frivolous" explanation distinguishing its noncompliance with Executive Order 13706,  which required covered contractors to provide their employees with up to seven days of paid sick leave per year:  under the law, the Railroad Unemployment Insurance Act provides the exclusive source of sickness benefits for covered employees.  45 U.S.C. § 363(b).[3]  Under the

---

[3] Here, the unions accuse Metra of hypocrisy, stating that "[i]t is interesting that Metra would put forth an argument that a federal statute, the [Railroad Unemployment Insurance Act], controls over an Executive Order while conversely pushing its argument that an enjoined EO somehow trumps a federal statute, namely, the RLA."  SMART-TD Reply at 5.  But Metra's position is inconsistent only if one accepts the unions' position that Metra's imposition of a vaccination mandate violates the RLA—which is exactly the opposite of what Metra contends.  Metra claims that it is entitled to unilaterally implement the vaccination mandate because of the executive order and its past practice of responding to federal law, which means that doing so would not be a violation of the RLA.  The Court also has a hard time seeing how one would equate consideration of a federal law imposing substantive requirements (like the Railroad Unemployment Insurance Act) with one that deals with the procedural aspects of how workplace changes are appropriately implemented (like the RLA, in the present context).

circumstances, the Court cannot say that Metra's noncompliance with Executive Order 13706 amounts to evidence that it is not, or does not consider itself to be, a federal contractor.

The unions' next point is that even if Metra is covered by the President's executive order, it cannot rely on the order as a basis for imposing a vaccination mandate, because the executive order has been enjoined nationwide. *See, e.g.*, *Georgia v. Biden*, No. 1:21-cv-163, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021). Metra maintains that it is nevertheless still bound by the executive order. It states: "while those injunctions may prevent enforcement, they do not invalidate the Mandate or Metra's contracts." Metra Resp. at 9. Metra further contends that it is entitled to rely on the injunction given that "the preliminary injunctions could be lifted at any point, allowing enforcement of the mandate to resume." *Id.* at 10. The Court finds that Metra's contentions on this point are not "obviously insubstantial or frivolous," and thus the dispute is still appropriately characterized as a minor dispute under the RLA.

Even so, the unions argue, Metra's mandate is flawed because it covers employees that "have nothing to do with the Canine Program." BLET Reply at 4. This is beside the point, at least for purposes of the Court's inquiry, as the executive order's vaccination mandate is not limited to employees who work on the federal contract; rather it covers all employees of the federal contractor. *See* SFWTF, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors 5 (2021). Specifically, the mandate "includes employees of covered contractors who are not themselves working on or in connection with a covered contract." *Id.* at 3.

Lastly, the unions argue that Metra's purported reliance on the executive order is

actually a post-hoc justification offered in an "attempt to avoid the required bargaining under the RLA."  SMART-TD Reply at 1.  This contention has no bearing on whether the dispute is major or minor.  The test is whether Metra has the authority to institute the vaccination mandate, not why it subjectively believed it had the authority to do that.  If Metra's basis for claiming authority to impose the mandate is not "obviously insubstantial or frivolous"—as the Court has found—then the dispute over the mandate is appropriately classified as a minor dispute under the RLA.  The unions do not cite any authority or provide any explanation stating otherwise.

In sum, the Court finds that Metra's contention that it has the authority to implement the vaccination requirement based on the executive order is not "obviously insubstantial or frivolous."  The Court therefore concludes that the dispute regarding Metra's implementation of the mandate is a minor dispute under the RLA.

### b.    Implementation of employee fitness and safety standards

Even without the executive order, Metra argues, it has the authority to unilaterally institute the vaccination mandate given its past practice of imposing requirements that protect the health and safety of its employees and passengers.  It cites instances when it unilaterally changed health and safety standards (e.g., requiring vision and hearing tests, blood tests, x-rays, and stool samples); changed other employee standards (such as drug and alcohol rules and physical standards for police officers); and set safety rules and standards for its workplace (including use of visibility vests, sleep apnea testing requirements, and medication restrictions).  "Given this extensive history," Metra contends, "it is not frivolous for the railroad to invoke its consistent practice of unilaterally modifying safety and fitness for duty policies as reflecting an authority to do

11

so with respect to vaccinations."  Metra Resp. at 13 (internal quotations omitted).

The unions dispute Metra's characterization of the vaccination mandate as a fitness for duty standard.  They state that "nowhere in Metra's vaccine mandate policy do they even mention that vaccination is required as a matter of fitness for duty.  Nor has Metra articulated how an unvaccinated employee is medically unfit for duty." SMART-TD Mem. at 11 (citation omitted).  But Metra is not required by law to expressly articulate its authority for imposing a change.  That aside, it is not true that Metra has not articulated how an unvaccinated employee is medically unfit for duty.  *See id*. at 5 ("[CEO Derwinski] noted a dramatically increasing trend at the federal, state, county, local levels and in the private sector that mandating the vaccine is the most prudent course of action to help everyone get back to our pre COVID-19 world.") (internal quotation omitted); *see also* Metra Resp. at 13 ("In these circumstances, Metra clearly has an implied right to adopt measures to keep its workforce healthy, safe, and productive (and to protect its customers from infection).").

The unions further argue that Metra "has never once unilaterally implemented a term or condition of employment that poses the level of invasiveness, physical threat and liability risk as a COVID-19 injection."  BLET Reply at 8.  These risks cited by the unions include the claimed physical risk of an adverse reaction from the vaccine as well as the economic risk of negligent administration of the vaccine without any ability to recover compensation.  Putting aside the fact that the economic risk argument was not made in the initial briefs, the main problem with the unions' argument is that it takes an inappropriately granular view of what constitutes a past practice that provides an arguable basis for an implied right on the part of the railroad.

As Metra points out, "a railroad is not required to cite a past practice on all fours with the practice at issue in order to prevail under *Conrail*." Metra Resp. at 13. For example, in *National Railway Labor Conference*, the Seventh Circuit affirmed the district court's decision holding that the railroad's past agreements with third-party suppliers provided a non-frivolous basis for concluding that it had the authority to enter into similar third-party contracts, despite the fact that the agreement could "be distinguished factually from the [railroad's] past practices." *Nat'l Ry. Lab. Conf.*, 830 F.2d at 749. The Supreme Court in *Conrail* made a similar determination, holding that despite the fact that the union's arguments distinguishing the railroad's past and present practices "conceivably could carry the day in arbitration," they were not enough to convince the Court that the railroad's interpretation was frivolous. *Conrail*, 491 U.S. at 317.

The unions suggest in their briefs that unless Metra can show a past practice of unilaterally implementing vaccination mandates, its argument is "obviously insubstantial or frivolous." This raises the bar too high. Although vaccination may involve more intrusion and more claimed risk than other procedures Metra has mandated in the past, these are differences of degree, not of kind. Again, Metra's argument on this point is not "obviously insubstantial or frivolous."[4]

For these reasons, the Court finds that, even without the President's executive order, the dispute regarding Metra's vaccination mandate is a minor dispute under the RLA and thus subject to mandatory arbitration under RLA section 3.

---

[4] The unions also contend that Metra's purported disparate treatment of unvaccinated employees as compared to other "unfit" employees underscores the frivolousness of Metra's arguments. SMART-TD Reply at 9. The Court declines to consider this argument, however, as it was made for the first time in a reply brief. *See Wonsey*, 940 F.3d at 398–99.

### 2.    The vaccination-related incentive payments

The unions argue that, even if Metra is not required to bargain over the vaccination mandate, it must bargain over the effects of the mandate, including the nature of disciplinary measures for employees who refuse to comply with the mandate and the offering of incentives to encourage vaccination.  The unions contend that Metra violated this obligation by unilaterally implementing the vaccination-related incentive payments.  They ask the court to enjoin Metra's implementation of the incentive program.[5]

Metra argues that it has the authority to award these vaccination-related incentive payments because it has a past practice of unilaterally awarding incentives. As examples, Metra refers to its quarterly 401(k) contributions, flexible spending accounts, tuition reimbursement, and smoking cessation programs, all of which it says are incentive programs that it implemented unilaterally.  Accordingly, Metra says, the contract does not preclude it from establishing incentive programs.  Metra has also stated, via its submissions to the Court, that it is willing to negotiate over the specifics of the incentives.

The unions respond that Metra's vaccination-related incentive programs are not actually incentives.  They accuse Metra of "mischaracteriz[ing] its current actions as merely offering incentives," when, the unions say, they amount to additional payments for a condition of employment (namely, getting fully vaccinated).  This is shown, the unions say, by the fact that Metra's prior incentive programs were targeted at desirable

---

[5] Such an injunction would have no effect on the vaccination mandate, which, as discussed above, can be implemented immediately.

but voluntary behaviors, whereas the current incentive program is associated with a mandatory condition of employment.

The unions make straight-faced arguments that might carry the day in negotiation and arbitration, but the Court cannot say that Metra's argument regarding its right to establish these incentives is "obviously insubstantial or frivolous." Metra's past practice reflects wide discretion in establishing payments encouraging employees to engage in desired behaviors. These include numerous incentives surrounding the coronavirus pandemic, such as paid time off to employees exposed at work and excused absences for those exhibiting symptoms. Getting fully vaccinated is yet another desirable behavior that Metra is arguably entitled to promote. The Court concludes that the dispute is appropriately characterized as a minor dispute within the meaning of the RLA and thus subject to mandatory arbitration under RLA section 3.

**B.     Enjoining the vaccination mandate even if the dispute is "minor"**

The unions have one final argument. They contend that, even if the Court finds that the disputes are minor, it should still enjoin the vaccination mandate because failure to do so will result in irreparable harm, nullifying any award from the adjustment board after arbitration. The unions contend that the Court should issue a preliminary injunction of the mandate pending resolution of the arbitration, to preserve what they refer to as the "jurisdiction" of the adjustment board. BLET Reply at 13.

"The general rule is that a railroad may 'continue to apply its interpretation of the agreement during the pendency of a minor dispute.'" *Nat'l Ry. Lab. Conf.*, 830 F.2d at 749. A court may, nevertheless, grant an injunction requiring the employer to maintain the status quo in order to preserve the authority of the adjustment board. *Id.* at 749–50.

15

To do so, the court must determine whether the traditional bases for injunctive relief are met.

As a threshold matter, to obtain a preliminary injunction, the movant must first show three things: (1) it has some likelihood of success on the merits; (2) it will suffer irreparable harm if relief is denied; and (3) traditional legal remedies would be inadequate. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If the movant makes such a showing, the court then moves to the balancing phase of the analysis. Here, the court weighs the harm that the movant would suffer without the injunction against the harm that the nonmovant would suffer if one was granted. *Id.* This assessment is made using a "sliding scale" approach, meaning that "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* Lastly, the court considers whether the preliminary injunction is in the public interest, namely, what effects the preliminary injunction will have on nonparties. *Id.*

The Court first analyzes whether the unions have made the requisite threshold showing for a preliminary injunction. Starting with the first factor: as discussed above, the unions present a number of arguments disputing Metra's purported authority to unilaterally impose the vaccination mandate. Although the bar for Metra to clear in order to move the dispute into arbitration is quite low, in the present context—a status-quo injunction pending arbitration—the question would appear to be the unions' likelihood of success *in the arbitration*. The Court cannot appropriately weigh in on the merits of any issues to be decided in arbitration, but it would be hard pressed to dispute that the unions have *some* likelihood of success in that forum.

16

The unions contend that they have met the irreparable harm requirement as well. They maintain that the vaccination mandate presents unvaccinated employees with what they call a "Hobson's choice," giving them no real option but to get vaccinated. Because vaccination is irreversible, the unions contend, Metra's mandate would result in irreparable harm.

The Court disagrees with the union's contention that the mandate presents unvaccinated employees with no real choice—which is what the term Hobson's choice means. In this regard, the Court need not address whether getting a vaccination against a deadly disease can rationally be considered "irreparable harm" and instead will focus on the other side of the coin. Although termination of employment has a serious impact on an individual's life and livelihood, it is not so debilitating as to amount to no option at all. This is particularly so because an employee who chooses not to be vaccinated and is then terminated has an adequate remedy: if the adjustment board agrees with the unions that the mandate should not have been imposed, reinstatement and backpay will be available and would make the terminated employee whole. *See Bedrossian v. Nw. Mem. Hosp.*, 409 F.3d 840, 845–46 (7th Cir. 2005). The Court concludes that the unions have failed to meet the irreparable harm requirement, one of the three threshold elements for a preliminary injunction. The Court denies their request on this basis.

Even if the unions had met the required threshold, the Court still would conclude that a preliminary injunction should not be issued. The balance of harms and the public interest weigh significantly in Metra's favor. To date, the COVID-19 pandemic has resulted in about three hundred million infections and five-and-a-half million deaths

around the world.  The vaccines—at least those currently in use in this country—have been shown to dramatically reduce the risk of serious illness and death from coronavirus infection as well as the incidence of transmission of the virus, making it critical that as many eligible people as possible get vaccinated.  Metra's vaccination requirement would contribute to this goal.  More directly, Metra has a strong interest in the health and safety of its passengers, and that of its employees as a whole, that will be promoted by its vaccination mandate.  The unions may lose some credibility as an effective bargaining representative in the eyes of their members, but this is far outweighed by the strong public health interest in achieving universal vaccination among Metra employees.  In this regard, the Court also notes that it appears most Metra employees have now met the requirements of the mandate,[6] but even a modest percentage of unvaccinated employees could expose others to an unwarranted risk and could also lead to disruptions in service if and when those employees contract the virus.

For these reasons, the Court declines to enter an injunction barring implementation of the vaccination mandate pending the resolution of arbitration.

## Conclusion

For the foregoing reasons, the Court denies the unions' motions for preliminary injunctions [dkt. nos. 22, 24 & 25].  The case is set for a telephonic status hearing on February 8, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053.  Counsel should wait for the case to be called before announcing themselves.  A

---

[6] At oral argument, counsel for Metra advised the Court that as of January 4, about thirteen percent of employees have yet to provide the necessary documentation to comply with the vaccination mandate.

18

joint status report is to be filed on February 1, 2022.

MATTHEW F. KENNELLY
United States District Judge

Date:  January 6, 2022